Energy Texas, Incorporated v. Nelson Okay, Mr. Laffon. May it please the Court, the energy operating companies for a decade have made and received payments as part of a program to roughly equalize costs in the energy system. And as FERC intended, each of these payments and costs has been passed through to customers until now. Do you represent the rate payers? No, Your Honor. I represent the PUC. Who? The PUC. As FERC intended, each of these payments and costs has been passed through to customers until now. As the District Court concluded that the PUC's order directing ETI to pass through a $10.9 million payment that it received in 2014 was preempted and that for the first time an energy operating company could pass through a bandwidth payment to its shareholders rather than its customers. And as this Court cautioned in White Buffalo, preemption radically alters the balance of federal and state authority. And for that reason, only a clear federal command justifies constraining a state's exercise of its traditional police powers. And none is present here. In concluding otherwise, the District Court overread the meaning of a single cell in a shell game played by ETI, the same game ETI plays on appeal. Before we get to those issues, however, I'd like to discuss ETI's settlement of a prior PUC proceeding because this issue can short circuit much of the debate in this case. ETI's claim of preemption boils down to the following assertion that the PUC cannot order it to pass through more than it has received. ETI points to first decision to say that it is only entitled to $41.3 million in 2006 base bandwidth payments. And then in a prior PUC proceeding, the PUC ordered it to pass through $49 million. But ETI settled its dispute in that prior proceeding. And in doing so, it agreed that it had in fact received that full amount, $49 million, that it was ordered to pass through. The upshot being that with the $49 million that ETI agreed that it received in 2007, and the $10.9 million that it received in 2014, the PUC has not ordered ETI to pass through a penny more than it has received in 2006 base payments. Now, ETI does not dispute that if its agreement means what it says, then there is no dispute here, regardless of how one reads first decision. ETI only argues that its agreement doesn't mean what it says. And that argument answers itself. Contracts must be applied as written, and ETI's agreement, which was adopted in a PUC order, states that ETI received the full $49 million in bandwidth payments. And so there is no dispute, or so there is no conflict here, regardless of what first decision means. If I may, I'll now turn to first decision and ETI's shell game. ETI claims that it is entitled to keep the current payment because in a prior PUC proceeding, the one just discussed, it had already paid more than it was entitled to receive for the 2006 test year. Let me just stop and make sure I understand how this all works, because I think I do, but I want to make sure. Yes, Your Honor. Let's suppose that in the initial FERC proceeding, 2014 was it? The initial FERC proceeding was in 2007. Okay, the 2007, all right, 2007, that EGI did exist and it was not integrated, it just served Texas. And FERC said, okay, your allocation is $43 million. Would the PUC have any discretion at all to, they say you pass through that much and no more or? Not if that was the only issue. If that was the only issue, then that would get directly passed through. If there was some other cost that they were able to take into account, then that could factor in. But if that were the only issue, then they would pass through, it would be the same thing that happened in this case, where ETI received a $10.9 million payment and all the PUC did was pass that through. So the PUC would have no discretion? Correct. Okay, so now what happened is the entities that were, excuse me, covering two states changed their form and it seems like what the Commission did was to go back and restructure the allocation among the entities as restructured. That's correct, Your Honor. But the important point is, the important point is what the purpose of that was. So ETI points to the chart and it says $41.3 million was all that ETI would have been entitled to receive had it existed in 2007 when the original payment was made. And it points to the $49 million number and it says, look, that shows that we paid too much. But those two numbers, 49 and 41.3, are answering two different questions, so it makes no sense to compare them. The first is an answer to a local retail question. That is, how much of the $120 million payment that the predecessor company received, there's no dispute that it received that payment, how much of that was due to Texas customers? And FERC looked at that and said there's no conflict with federal law. Now ETI points to that and says, well, we're the ones that passed it through. But they didn't pass it through because of any judgment as to what they were entitled to receive in 2007. That wasn't part of that proceeding. They had to pass it through because by then they had stepped into the shoes of the predecessor company and had to take on its liability. So that $49 million number has never had anything to do with how much ETI was entitled to receive had it existed in 2007 when the payment was made. So to look at that 41.3 number and find a conflict here, you would have to conclude not just that FERC meant to say, well, this is what you would have received, and the reason FERC did that was because that was the only way to figure out how much of a true up payment ETI would get, but you would have to say that FERC intended that to mean that that's how much your predecessor company should have passed through. No, I think it seems to me they're taking the position we're not trying to undo what happened with respect to the PC settlement. All we're saying is that going forward, we don't recoup it, but we don't have to pay double pay, basically. Well, right, Your Honor. But in order to show a double payment, you have to point to that $49 million number. And unless those numbers are payments for the same thing, there's no overpayment. And so the $49 million number, unless that number was connected to how much ETI should have received, then there's no overpayment. And it's not. If you look at page 54 of ETI's brief, it tells you where this $49 million came from. It says that the PUC correctly concluded that the predecessor company had received $120 million, and that the only issue in dispute in that case was the method that the PUC would use to allocate that payment to Texas customers. And FERC has not only concluded that it has no jurisdiction to consider that question, but it said that the PUC's answer was correct. And so, again, the fact that ETI passed this payment through, this $49 million, has nothing to do with how much they were entitled to receive. And therefore, they can't point to this $49.3 million and simply say, because those numbers don't match, we've overpaid. What they have to argue is that FERC intended that $41.3 million to mean that that's the amount, or that that's the total amount that the previous company should have passed through. But nothing in FERC's order talks about Texas retail customers and how much the predecessor company had to pass through. And in fact, on page three of ETI's brief, they say that the bandwidth formula is only concerned with what operating companies get. It's not concerned with what retail customers get. And FERC itself, in its order, said, look, we need to distinguish the prior payment, the $120 million that the predecessor company received, from these true-up payments. It's these true-up payments that need to reflect the current companies. It's not what happened with that previous payment. And FERC said, we're only concerned with the latter. We're not concerned with the former. And with the limited time that I have left, I want to stress that, at the very least, there's nothing clear in this order that justifies the injunction that the federal court entered here, or sorry, that the district court entered here. As this court explained in White Buffalo, when there are two interpretations of a federal authority, both rooted in the text, that ambiguity triggers the strong presumption against preemption. Well, let me ask you this. If the reverse had been true, if ETI had been ordered to pay $10.3 million to Arkansas or somebody else, would they automatically be entitled to recoup that from customers? Yes. Every payment and every cost is passed through. There is no exception. And there's a chart that we've cited. Every single one is passed through. That's what we've done in every case. And so for something to change here, you would expect some sort of clear statement. But there is none. And as the Supreme Court said in Bates, if there are two plausible readings, you take the one that disfavors preemption. And so, sorry, the Supreme Court has also said that you need clear evidence to overcome the presumption against preemption. There's nothing clear in this case. And for that reason, the court should reverse the injunction entered by the district court and direct judgment in favor of the PUC. All right. Thank you, Mr. LaFont. You've saved time for rebuttal. Mr. Van Middlesworth. May it please the Court. I plan to discuss three things. First, the PUC's 2009 decision assigning $49 million to Texas customers. Second, ETI's 2010 acceptance of that decision, abandonment of all of its appeals, and stipulation that it had, in fact, received that full $49 million. And third, that there's no way to look at ETI's attempt to keep the $10.9 million that it got in 2014 other than as a challenge to this final decision in 2009, which ETI may not do. So, as you know, in 2007, Gulf States was operating, and it received, for the last six months, 2007, monthly, this total amount of $120 million. All parties agreed that goes to rate payers, but which state? Texas decides for Texas, Louisiana decides for Louisiana for a multi-jurisdictional utility. Texas said, well, we're 41% of the sales and the cost. We get 41% of it. Louisiana took a different approach, which gave Louisiana $18.6 million more than that, and Texas $18.6 million less. Consequently, the utilities were ordered to refund $18.6 million more than the $120 million that EGS got. That happened. Entry appealed to FERC, and FERC made it clear that it lacked jurisdiction. That's a risk, sometimes a benefit, of operating in two jurisdictions that you'll get decisions that don't always exactly match up. And back in Texas, ETI appealed the PUC's decision, state and federal courts. And a few months later, it filed for a rate case and a fuel reconciliation case that covered this period, 2007 to the first half of 2009. And we as consumers groups and ETI and the PUC staff and others settled that case with a $59 million rate increase, a small disallowance of fuel costs, and ETI's agreement and stipulation, among other things, to credit rate payers with the remaining $18.6 million, which they hadn't really put in the account yet, dismiss both of the appeals of 35269 with prejudice. So there was no longer any judicial vehicle for challenging the commission's decision back in 2009 that $49 million was the appropriate amount. And in a belt and suspenders approach, to make it even clearer, ETI specifically stipulated in that case that $49 million was the actual amount of Gulf States' $120 million RPC receipts that ETI received as its share in 2007. It sprang into existence last day of December 2007. That's when it took the assets and liabilities of Gulf States. So why did we do that? To ensure that there could never be a claim that $49 million was wrong, because ETI stipulated there's no harm. ETI paid out $49 million. It now stipulated that it received $49 million. That finding was included in the PUC's order, which is cited. No party appealed it. That order is final and unappealable. The book is closed on reconcilable fuel costs for 2007 to 2009. And ETI admits in its brief that it's abandoned any challenge to this order. But there's no way to characterize ETI's proposal here as anything other than a revisitation of that order in an attempt to offset the $49 million it previously refunded, which it claims still in this case was $18.6 million too much. Now it admits that it can't directly get back the $49 million. It can't surcharge the $40 million. But it asserts that it can do indirectly the same thing. It received this $10.9 million. It got a check for $10.9 million in 2014, just as it has received many times before, or made payments many times before. And when that check comes in or the check is written, the commission must accept that. And so had ETI had, as a result of this recalculation, had to pay $10 million more, that would have been surcharge for ratepayers. Instead, they got a check. ETI got a check, really. ETI's first check from the other utilities for this period for $10.9 million. That goes to the ratepayers, just as it has in every time for every other RPC e-payments. They have to be. So what's the basis for ETI to say, this time, this $10.9 million that I just got is mine, not the ratepayers? There's only one basis for that, that in 2009, the Texas Commission awarded $49 million when it should have only awarded $30.4 million, according to its chart. And as a result, we've paid too much because of that $49 million too much. That claim is foreclosed by the dismissals with prejudice of its appeals, by its agreement that the $49 million is exactly what it received, and by the fact that the fuel reconciliation period for 2007 and 2009 is finally closed in a final unappealable order. Thank you, Your Honors. Thank you, Mr. Middlesworth. Ms. McCormick? Good morning. May it please the Court. I'm Marnie McCormick here on behalf of Entergy Texas, or ETI. And in my time this morning here, I hope to address or explain why all three of appellants' main arguments are wrong. First, in the recalculation for the 2007 bandwidth filing, FERC did approve a single total amount of money that ETI should receive to roughly equalize production costs. And that decision did not result in a mere supplement to the initial calculation. The recalculation replaced the initial calculation. Second, ETI— For FERC's purposes. I'm sorry, Your Honor? For FERC's purposes. I mean, in other words, let's suppose that originally there had been no dispute. You'd gotten the 43—was it $43.1 million? The PUC said you're entitled—that passes through to ratepayers, whatever. There's no dispute. Now there's a true-up, $10.3 million. You would automatically pass that through, correct? Your Honor, when—under normal circumstances, payments are passed through as they're stated in FERC's orders. This is a very unique situation because in this case, the money that was passed through under the initial calculation, that was an interim calculation. And it was replaced in the end by a completely new— But you settled that. I mean, you settled the interim calculation. You agreed. You gave up on your argument that it's only 43.1. You judicially admitted in exchange for a $59 million rate increase that it was 49, not 43. So I don't see how you can go back and— That's actually the point that I was going to get to, is ETI has not stipulated that it actually received $49 million of the initial calculation. That is actually an argument that they've manufactured for the first time in their briefs to this Court. It is not a basis of the PUC order that's before the Court today. The PUC, in its order before the Court, gave one reason and one reason only for ordering this pass-through. The PUC said it was interpreting FERC's recalculation order. That's all the PUC said. It did not say it was ordering this pass-through for some different reason or for its interpretation of a past stipulation. I'll also note that that stipulation is not in the record. Counsel's apparently provided you a copy of—a snippet of the stipulation. Aside from the fact that it's not a basis for the PUC's order, they're mischaracterizing this stipulation. They're taking one word out of the stipulation and spinning it out of context. When you read the entire stipulation, even the piece that they've reproduced in your bench handout, it's clear that what ETI did was agree to credit Texas customers the issue in the old PUC document. The 18-some-odd-million. Exactly. The difference between—yes. That's right. ETI had been challenging the PUC's— But you didn't say, all right, we're just crediting this temporarily until the final true-up, did you? You said we're crediting it permanently. We're settling this. They just agreed to credit the customers. There was no— But they didn't—right. And they didn't say subject to this is all going to be up in the air again when we get the final true-up. I have to admit that the ETI couldn't have waived its rights that hadn't even accrued at that point. At the point that this settlement was undertaken, everybody knew there were multiple FERC dockets open where the bandwidth formula and how it should be calculated were being litigated for this very compliance filing. Those dockets were ongoing. All ETI did here was agree to pass through this $18.6 million to customers and stop challenging how the PUC had done the retail allocation. But ETI did not stipulate or give up its rights under a FERC decision that hadn't yet been made and wouldn't be made for another six years. It took six more years before FERC actually got around to wrapping this all up and determining that an entirely new calculation had to be undertaken. And when FERC did that in the 2015 order, FERC clearly said, we are allocating a grand total for the 2015— Well, let's take a hypothetical. Let's say FERC had done—in the recalculation, it had come out exactly the same way. Would you now be able to go back and say, wait a minute, we get to pass through $18.9 million because we weren't made whole? No, Your Honor. No. And we're not asking for money back here. Texas customers have been credited the $18 million or $18.6 million. Well, it seems like you can't—you all had to come up—the global entity that existed before had to come up with dollars above and beyond the allocations that FERC made, $18 million. $18 million dollars, I assume, above and beyond what the true up—the temporary true up was. That was out of somewhere. You're not going to get that back from the true up. I mean, that's if you agreed to—because you paid more out of pocket than you were going to get back in the temporary true up, and it seems like to me you voluntarily agreed to pay that. Well, we did pay it, and we're not getting a dollar back from Texas customers. So if the commission that FERC ultimately came out and said, everybody's square, we hit it right on the money, nobody owes anybody else a dime, where would you be? I think we would let it sit, but you couldn't get the $18—you couldn't get any kind of credit. You know, it's—that may be—there may—because the stipulation was only concerning the initial interim payment, ETI may have had an argument that once FERC supplanted that entire initial calculation that it was entitled to get back to FERC's final total. But that's actually not what ETI is asking. Well, I'm just saying logically, I'm trying to see where—how this plays out. In theory, that may be something that ETI could have done, but ETI hasn't done that. It's not asking to get the money back. There's still dollars trapped by FERC's final decision in the recalculation. I think it might help to step back and look at what happened here. In 2007, the bandwidth formula is actually a set of complex formulas with lots of variables, and the 2007 calculation was the first time that the formula had been applied. And so it was in the context of this 2007 filing that most of the disputes arose. And when FERC accepted the initial calculation, FERC expressly said it was accepting that initial calculation subject to refund and hearing. And at the time, EGSI was the relevant—was the receiving entity. So when that initial calculation was made, the multi-jurisdictional operating company was in existence, and so that's where the money flowed. ETI did not receive that money. ETI has never stipulated that it received that money. It makes no sense. ETI didn't even exist in 2007. It couldn't have received that money. But its predecessor did. Its predecessor did, and that's why the PUC got to decide how much of that payment went to Texas customers at that time. But since then, something has critically changed. FERC decided after years of litigation over these—the disputes about the components of the formula and whether it was meeting FERC's objective. After years of that, the Entergy System Agreement changed. When EGSI split, it was no longer a named operating company under the bandwidth formula, the FERC tariff. The two successor companies were actually named in the Entergy System Agreement. And so the bandwidth formula on its face required FERC to allocate the recalculated amounts among the successor entities, didn't even allow FERC to allocate dollars to EGSI. And the first time that FERC was presented with this problem, where it has data from a company that no longer exists and a formula rate that requires calculations and payments and receipts to be allocated to existing entities that didn't exist back in 2006. The first time FERC was confronted with this was actually in opinion 514, and that involved the 2008 calculation. And TIEC made the same argument there that it's making here. It said, FERC, EGSI is the company that existed when these costs were being incurred, and so you should allocate payments and receipts to EGSI and let retail regulators divvy them up how they see fit. And FERC disagreed. That is very clear in opinion 514. FERC said it not only had the power but the duty to allocate those costs, payments and receipts among the existing operating companies, even though they didn't exist at the time that the costs were being incurred. FERC said that in opinion 514, and when it said that, it recognized that its decision on this issue would impact retail rates. But that did not deter FERC from applying its filed rate, the bandwidth formula, as it was written. And that same exact reasoning appears in FERC's 2015 order approving the recalculation for the 2007 compliance year. That's the filing that's before you now. So FERC actually, TIEC, made the same argument, but wait, but wait, EGSI is the company that existed in the past, and FERC said, no, following the logic of opinion 514, we're bound to allocate these dollars among the currently existing operating companies. And FERC even expressly rejected TIEC's argument that the 2009 decision would not require a different result. The 2009 decision is the one that you heard counsel for the PUC talk about this morning. They hang their hat on it and say, FERC didn't step in and do anything about the PUC's allocation of the interim payment. But they're mischaracterizing what FERC said in that 2009 decision. FERC did not bless the PUC's initial allocation in that 2009 decision. I've included it in your bench packet, and it is cited in our brief. All FERC said in that case was that the initial calculation resulted in a payment to EGSI, and that is all that the bandwidth formula requires. FERC allocates dollars to operating companies. It doesn't allocate dollars to retail jurisdictions. So FERC said, we don't have jurisdiction to do anything about what the PUC did with the That reasoning, that is completely consistent. I think my point is, FERC did not say that the PUC correctly allocated those dollars. And FERC didn't say in 2009 what should happen to a recalculation or any calculation that occurred after EGSI split. And that's what's at issue here. And basically, FERC has recalculated the entire thing and said, here's the total amount of money that ETI is entitled to for this bandwidth filing. That's $41.3 million. ETI has passed through more than that. It's not asking for money back, but it is asking you to uphold the decision that the PUC has paid, the amount that FERC has finally settled on for this compliance year. I want to spend a few minutes just addressing Council's argument that there's this sort of notion that the $10.9 million in FERC's 2015 order was the whole point of the calculation, that the whole point of this recalculation was to come up with a true-up payment that's completely divorced with or from the initial calculation. But there are multiple FERC orders that establish that that's wrong. The whole point of the recalculation was to redo everything because so many things had changed over the years. Well, here's the way I'm thinking. Correct me if I'm wrong. There was a total amount allocated to the old, former global entity from FERC as the bandwidth payment. And on top of that, the formal global company came up with another $18 million out of its own pocket to settle the jurisdictional, the intrastate jurisdictional retail issues. So that money didn't come out of any bandwidth payment. They decided it out of their own pocket in exchange for other things to make a settlement. So it seems to me we have to disregard the $18.9 million because that was above and beyond the total, the global total that FERC was talking about. So I don't see how they get to recoup any of the $18.9 that they themselves put on the table to settle the case. So they're not recouping any of that money. They've passed through the $18 million and they're not asking for any of it back from Texas customers. I think what you're getting at here, the tension that you're feeling is that when FERC stepped in and recalculated everything and supplanted that initial allocation, FERC's decision had the effect of offsetting some of the trapping, the $18 million. Offset $10.1 of the... Right. That's right. So there's still another $7 or $8 million that's trapped. But FERC's ultimate decision here in the recalculation does mitigate some of the trapping that occurred. But FERC recognized that would happen, but that is a consequence of how the FERC tariff is written. And FERC applied it as written. It said it was bound as a matter of law to do that. That is the filed rate. And so is the chart in the recalculation order. The chart that we see so much about in the briefs and they say that Intergy just provided those numbers to the commission and the commission just included them as some sort of... Just reprinted them, but didn't approve them. That's not correct. FERC itself has said that not only is the bandwidth formula a filed rate, but the calculations under the formula, once accepted by FERC, become filed rates themselves. And FERC decided in 2015 this is the amount of money that the revised bandwidth formula yields. For the entire period. For the entire period. And it made its order effective from the beginning of the compliance period, starting June 2007, even though the decision was made in 2015. So there's no question that FERC intended this to be a redo. It was effective from the beginning of the compliance period. Here is the number that the federally approved tariff yields. This is a filed rate. And nobody appealed that decision. That decision is final. And so the PUC is bound to respect that decision. And what they're doing here is even though Texas rate payers have received every dime plus seven or eight million more than the number that FERC landed on, the PUC is ordering ETI to pass through an additional $10.9 million. There's just no logical basis for that. Their whole theory is that they're entitled to keep an $18 million worth of trapping that occurred, but that's not what the federally approved rate dictates now. And FERC has acknowledged that its decision under the filed rate is going to impact retail rates and it did it anyway. And nobody challenged FERC's order. It's really that simple. So, we would just ask that you recognize that what the PUC has done here is effectively misconstrue FERC's decision in its 2015 order approving the recalculation. There's a direct conflict between the PUC's ruling and FERC's ruling. And under the law, FERC's order controls, because FERC is a federal agency with exclusive jurisdiction, to set interstate wholesale rates like these. Well, I think that brings me back to one of my early questions. Suppose FERC had said, we got it right, miraculously the numbers came out the same, nobody has to pay anybody anything so that there's zero due on the full and final settlement. Where does that leave you? Under your logic, you would be able to go back to the PUC and say, wait, we passed through more than we should have and we should get some of that back. Logically, that's possible. It's not what Entergy has asked for. All Entergy is recognizing is that FERC's order had the effect, the end order had an effect of mitigating or offsetting some of the trapping that occurred under the interim payment. That was an interim payment that was made subject to refund. There's really no logical inconsistency with ... Texas customers have received the money. It's just that FERC has stepped in and wiped out the basis for that payment to Texas customers. ETI's not asking for a refund, but FERC has gone in and replaced the order that caused those dollars to flow. That's all. We just ask that the district court got this right and that you affirm the district court's judgment. All right. Thank you, Ms. McCormick. Thank you. Mr. Lafond, do you save time for rebuttal? I'd like to start just where counsel left off because she said something very important. She said that FERC's order wiped out the basis for the $49 million pass-through, but what she did not do in her entire argument was actually tell you what that $49 million pass-through was for, but they say it in their brief at page 54. That pass-through had nothing to do with what ETI was entitled to under any FERC formula. That $49 million was what the PUC determined that of the $120 million payment that the predecessor company received, how much was due to Texas customers. And they also say that, well, this was the first time that FERC had ever had to deal with this issue. That's not true. When ETI went to FERC the first time to challenge that $49 million payment, they made the same argument they're making here. And they said to FERC, please amend the system agreement retroactive to June 1, 2007 or sometime how to allocate these things to retail jurisdictions. And FERC said we simply don't have jurisdiction to do that. But it's the same thing they're asking for here. They're saying what FERC did was with this $41.3 million is went back in time and said we're going to affect what happens with the jurisdictional allocation. But the Federal Power Act has not changed between now and then. FERC still has no jurisdiction to go back and affect a retail allocation. So what happened here is the predecessor company, and they talk about one total payment. The total payment here was $150 million. The first 120 went through and the predecessor company existed at that time and so it was allocated by the state agencies. And then an additional $30 million payment came through. By that time the company said split. So FERC took care of the allocation. That's all that's happened here. Nothing has gone back and changed that $49 million and they have done nothing to connect those two. So you cannot find that there was an overpayment based on the $41.3 compared to the $49 because there's no connection. They're answering two different questions. If I could talk about the settlement. If you look at ROA 482, this very language is cited in the record. And the language says the signatories agree that ETI will credit an additional $18.6 million to Texas customers. ETI wants you to stop there. They want you to say, okay, all we agreed to do is credit the money to customers. But there's a comma there and what follows is this. The signatory stipulated that this represents the remaining portion of bandwidth payments that ETI received in 2007. And they say, well, we didn't exist in 2007. Again, not true. The predecessor company split on December 31, 2007 and with that liabilities and assets went to the two companies. So a perfect way to read this is that ETI got $49 million in bandwidth payments, exactly the amount that the PUC has ordered them to pass through. And they say that the PUC's order below didn't rely on this. Again, not true. The finding of fact 49 in the PUC's order below, which I believe can be found on ROA 647, cites the settlement. And then if you go back a page before, finding of fact 33, it says what happened was $49 million in bandwidth payments was passed through. Bandwidth payments. They didn't say, well, $30.4 million was passed through and then $18.6 million was passed through. I don't know what that was. It says $49 million in bandwidth payments was passed through. And we argued to the district court that ETI had bargained their claim away by settling this. We raised this issue with the district court. We've cited this finding of fact numerous times below. And so there's no argument that we forfeited anything here. And in fact, they didn't argue forfeiture in their brief. And so if anything is forfeited, it's their argument about forfeiture. If I could just end again with the presumption against preemption. They didn't mention it in their argument. The presumption against preemption requires clear evidence, requires only one way to read a federal authority. Enjoining a state utility action is a very serious matter. This is in the heart of what states are entitled to do. And it is simply not enough to rely on a single cell in a chart that doesn't even correspond with the purpose of that chart. So let's say FERC treated ETI as a single Texas provider for the calendar year of 2007 in its final true up order. It is fair to say that it calculated it as if it existed as an independent entity. Throughout the year, 2007. And when the payment was made. So in order to figure out how much was owed to ETI, it had to put ETI in the place then in 2007. And that's what it was doing. It said if you existed in 2007, how much would you have gotten under the old formula and how much would you have gotten for the new formula? So it treated ETI as in existence and solely a Texas provider, if you will, throughout the 2007 period. No, Your Honor. What I'm saying, what FERC did was they simply said, like FERC didn't make up history. FERC said if you look at the papers that ETI filed, going back to decision 514, what FERC said was this is what you do now that the company has split up. You calculate what's owed to the old company and then you split it up to the two new companies to make them have the same deviation from the average. So what Entergy did here was they said the old company is owed $22 million. And then they said, all right, not including interest, $29.9 million, including interest. And that was the true up payment. Then there's a separate section of the system agreement that says this is how you split it up. And that's where they went through and they said, all right, the way that we're going to split this up is we're going to say if ETI existed in 2007, this is how much they would have gotten under the old formula, this is how much they would have gotten under the new formula. $10.9 million went to ETI, the remainder went to the Louisiana counterpart. There's nothing in FERC's decision that says everything that happened before, including retail allocations, now must look as if ETI existed in 2007. And if you go back to the FERC decision that we were talking about earlier, ETI asked it to do that. It said, with the $49 million, it said, please, we exist now. Please amend the system agreement retroactive to before the payment was made so that we can decide how these things go. And FERC said we don't have jurisdiction to do that. The retail allocation is outside of our purview, so we can't do anything. We can't amend a system agreement. We can't issue an order. We can't do anything that has any contemplation about what it's going to do for retail rates. Now of course it's going to affect retail rates because you have to pass those through or you have charges and things like that. But their argument that FERC intended to go through and say, well, this is going to completely wipe the slate clean for retail allocations, there's no way to reconcile that with FERC's previous decision that it did not have jurisdiction over this issue. And if there are no further questions.